# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**THEODORE SMITH (#313084)**            **CIVIL ACTION**

**VERSUS**

**BURL CAIN, ET AL.**            **NO. 09-0322-JJB-DLD**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August, 22, 2012.

**MAGISTRATE JUDGE DOCIA L. DALBY**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**THEODORE SMITH (#313084)**            **CIVIL ACTION**

**VERSUS**

**BURL CAIN, ET AL.**            **NO. 09-0322-JJB-DLD**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court following an evidentiary hearing held pursuant to 28 U.S.C. § 636(b)(1)(B) on the plaintiff's Motion to Withdraw and/or to Reinstate Lawsuit, rec.doc.no. 37. The Court has jurisdiction over this matter by virtue of 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983.

### Procedural History

The pro se plaintiff, an inmate previously confined at the Louisiana State Penitentiary ("LSP"), Angola, Louisiana, filed this action pursuant to 42 U.S.C. § 1983 against Warden Burl Cain, former Secretary Richard Stalder, current Secretary James LeBlanc, John Robson, Kevin Benjamin and unnamed employees at LSP, contending that the defendants, inter alia, violated his constitutional rights under the First and Fourteenth Amendments to the United States Constitution by forcing him to listen to religious programing on the prison radio and television networks at LSP, by utilizing state funds to support this practice, by requiring inmates to contribute moneys to support religious programs and practices, by effectively endorsing the Baptist Christian faith through the allowance of a Baptist Bible college on prison grounds, by thereby discriminating against inmates of other religions and against those who are not religious, by utilizing state buildings to house the Bible college, by utilizing state funds to build and maintain religious structures, and by misappropriating funds for the purpose of supporting religious activities at the prison.

On August 20, 2010, a Magistrate Judge's Report was entered herein which recommended denial, in part, of a Motion to Dismiss filed by the defendants. Shortly thereafter, on August 25, 2010, the parties entered into a settlement agreement and thereafter filed a Joint Motion and Order to Dismiss, rec.doc.no. 34. Two short settlement agreements, one hand-written and one typed, were attached as exhibits to the parties' Joint Motion to Dismiss, providing that the plaintiff agreed

to dismiss this matter, with prejudice, and that the defendants agreed to pay the plaintiff's outstanding court costs in this case, to reimburse the plaintiff all monies previously paid by him herein, and to clear all of the plaintiff's institutional debts through the date of settlement. In addition, although not stated in the referenced settlement agreements, the parties also apparently agreed that the plaintiff would be re-assigned from a working cellblock to living quarters at the main prison complex, would be given a job as an inmate counsel, would be provided with the higher pay commensurate with that job, would be re-classified as a prison trustee, would be issued a hobby box, and would have two disciplinary charges expunged from his prison record. Defendant Cain also apparently agreed to recommend the plaintiff for a transfer to the Louisiana Police Barracks, to recommend the plaintiff for parole at such time as the plaintiff was considered for parole, and to allow the plaintiff to attend school at the Bible college and, upon graduation, to teach at the college if he wished. On September 28, 2010, the Court granted the parties' Joint Motion to Dismiss and dismissed the above-captioned proceeding. See rec.doc.no. 35.

Approximately 6 months after the parties entered into the referenced settlement agreement, on or about March 4, 2011, the plaintiff filed the instant Motion to Withdraw and/or to Reinstate Lawsuit, rec.doc.no. 37. In this motion, the plaintiff seeks to repudiate the agreement. He asserts that on the day that he entered into the agreement, he was called to the office of defendant Warden Cain and was there urged by defendant Cain to agree to settle the underlying claims made herein. When the plaintiff refused to do so after a period of negotiation, defendant Cain allegedly threatened to have the plaintiff killed and to have the plaintiff's body cremated so as to cover up any incriminating evidence. According to the plaintiff, defendant Cain boasted that he had previously gotten away with murdering and cremating a co-inmate by the name of Joel Durham. The plaintiff asserts in the instant motion that it was only after this "death threat" from defendant Cain that he decided to enter into the settlement agreement because, in his view, his options were to "either settle or be killed."

In response to the plaintiff's Motion to Withdraw, the defendants filed a Motion for Summary Judgment, and the Court thereafter allowed limited discovery with respect thereto. Pursuant to Magistrate Judge's Report dated February 14, 2012, approved by the District Judge on March 8, 2012, see rec.doc.nos. 75 and 76, the Court denied the defendants' Motion for Summary Judgment,

and the matter was referred to the undersigned for an evidentiary hearing on the plaintiff's Motion to Withdraw and/or to Reinstate.

## Review of the Evidence

With regard to the confection of the referenced settlement agreement, the plaintiff testified that on August 24, 2010, four days after the entry of a Magistrate Judge's Report which recommended denial of the defendants' then-pending motion to dismiss, he was approached in his cell by prison personnel who discussed with him the possibility of voluntarily dismissing the instant lawsuit. When the plaintiff deferred, he was summoned the next day, August 25, 2010, shortly after noon, to defendant Burl Cain's office, and the parties there discussed the possibility of settlement. According to the plaintiff, after a relatively long period of negotiation,[1] defendant Cain ultimately offered to the plaintiff in settlement all of the benefits outlined above. Notwithstanding, the plaintiff continued to resist settlement and, according to the plaintiff, at some point during the afternoon, defendant Cain stated to the plaintiff, when they were alone together in the defendant's office, that if the plaintiff did not settle the lawsuit, the defendant would have the plaintiff killed and cremated, just as the defendant had done with another inmate in 1999. The plaintiff testified that this threat caused him to fear for his life, and he believed that he had only two options, to either agree to the settlement or to be killed upon orders of defendant Cain. The plaintiff testified that he was aware of the 1999 death of the referenced co-inmate but was not aware that defendant Cain had ordered the co-inmate killed and cremated. The plaintiff further testified that he was aware of at least one other inmate who had died under suspicious circumstances at LSP and also of inmates who had been beaten by security officers. He testified that he himself had been beaten on one occasion by a security officer in July, 2007, as a result of which incident the plaintiff continued to suffer from and receive treatment for post-traumatic stress disorder. The plaintiff testified that, at one point during the afternoon (at approximately 3:25 p.m.), he was allowed to make a 15-minute telephone call to an outside friend, Candice Watkins, the then-mayor of Walker, Louisiana. Although the plaintiff wanted to inform Mayor Watkins of the threats being made by defendant Cain, he did not do so because defendant Cain was hovering nearby, causing the plaintiff to fear for his safety. Finally,

---

1. Prison records apparently do not indicate when the plaintiff was brought to defendant Cain's office, but it appears from these records that the plaintiff was returned to his housing assignment after 4:00 in the afternoon.

the plaintiff agreed to the settlement of the instant lawsuit. He asserts, however, that he never wanted to settle the lawsuit and that he did so only out of fear caused by the threats communicated by defendant Cain. He further testified that he signed one of the referenced settlement agreements on August 25, 2010, and that he signed the second several days later, in early September, 2010.

Defendant Cain testified that he called the plaintiff to his office to discuss settlement after issuance of the Magistrate Judge's Report in this case which recommended denial of the defendants' pending motion to dismiss. Defendant Cain acknowledged that he was "concerned" about the underlying lawsuit inasmuch as he believes that the religious programs available at LSP, including the Bible college, the several chapel buildings, the religious clubs, and monies generated therefor from the prison rodeo and the sale of hobbyshop items, give hope to inmates and are extremely important in promoting their rehabilitation and in improving security at the prison. He testified that his discussions with the plaintiff on the afternoon of August 25, 2010, were cordial and non-adversarial, that the plaintiff was an excellent negotiator, and that the terms which were ultimately offered in settlement and agreed to by the plaintiff were very favorable. As testified by defendant Cain, these benefits were essentially all that could be offered to the plaintiff in settlement short of opening the doors of the prison and allowing the plaintiff to go free. The defendant further testified that he and the plaintiff were alone in the office for only brief intervals of time and that there were other people present most of the time. He denied that he made any threat whatever to the plaintiff in order to induce the referenced settlement, and he stated that the plaintiff seemed very happy with the ultimate settlement agreement.

Also with regard to the confection of the settlement agreement, the plaintiff called as witnesses Ass't Warden Stephanie LaMartiniere, Attorney Terri Cannon and Ass't Warden (now Deputy Warden) Bruce Dodd, who is also an attorney, all of whom were "in and out" of defendant Cain's office on the afternoon of the date in question, all of whom witnessed the plaintiff's demeanor and interaction with defendant Cain, and all of whom interacted with the plaintiff themselves during the course of the afternoon on that date. They each testified that the plaintiff appeared to be at all times relaxed, that he was laughing and talking, and that he did not seem upset, nervous or scared in any way. They testified that they neither observed nor heard any threats, acrimony or raised voices exchanged between the plaintiff and defendant Cain although they admittedly were not present at all times that the plaintiff and defendant Cain were together. Terri Cannon, the attorney

assigned to LSP, testified that she met privately in a separate office with the plaintiff during part of the afternoon and discussed with him her view of the legal aspects of the plaintiff's case. She testified that at one point, the plaintiff asked whether he could receive all of the benefits that were being offered in settlement yet still continue with the case. According to Ms. Cannon, she refused this proposal and began to gather her papers and to discontinue the discussion, at which time the plaintiff finally agreed to settle the case. Defendant Cain and each of the three witnesses testified that they observed the plaintiff sign the two settlement documents and that he did so without objection and without complaint, with witnesses LaMartiniere and Dodd signing the agreements as witnesses and with witness Cannon signing the agreements as notary.

Questions were raised during the evidentiary hearing as to which of the two settlement documents was prepared first, whether both of the settlement documents were executed on the same date, and why two separate settlement documents were prepared. Specifically, Bruce Dodd recalled that the hand-written version of the settlement agreement was prepared first by him, followed by preparation of the typed version, whereas Terry Cannon and defendant Cain recalled that the typed document was prepared first (by Ms. Cannon), followed by preparation of the hand-written document. In addition, defendant Cain and witnesses LaMartiniere, Cannon and Dodd testified that both versions of the settlement agreement were executed on the same date whereas the plaintiff testified that he signed one of the documents several days later. Finally, it appears that neither document reflects all of the terms of the settlement agreement, with Warden Dodd testifying that it was his belief that any omissions were likely the result of mere inadvertence or oversight on the part of prison officials. These questions, however, do not appear to be important to resolution of the ultimate issue in this case because neither of the settlement documents is inconsistent with the parties' testimony regarding their acknowledged agreement to settle the case, all of the parties testified consistently regarding the terms of the settlement agreement (notwithstanding that all of the terms were not incorporated into the written documents), and both documents bear the same date, August 25, 2010, and are signed by the plaintiff, defendant Cain, Warden LaMartiniere, Warden Cannon and Warden Dodd. The parties also entered into a stipulation prior to trial,

agreeing that all aspects of the settlement agreement were complied with by prison officials shortly after the settlement.[2]

Turning to events occurring during the months subsequent to the execution of the referenced settlement agreements, it appears that notwithstanding the plaintiff's testimony that he was never happy with the settlement, he took no action whatever to repudiate the agreement for more than five (5) months. According to the plaintiff, his reason for taking no action was because he was scared that defendant Cain would carry out the asserted threat and have the plaintiff killed and cremated. The plaintiff further testified that it was not until February, 2011, that he finally saw an opportunity to take some action. Specifically, the plaintiff testified that on February 3, 2011, he was charged with several disciplinary reports, which reports, he asserts, wrongly accused him of attempting to eat twice in the prison cafeteria on that date and, when confronted by prison security officers, of resisting orders and refusing to allow himself to be handcuffed. As a result of these disciplinary reports, the plaintiff was placed in administrative segregation, i.e., in a cell awaiting a hearing and potential punishment in connection with the referenced charges. According to the plaintiff, he saw these disciplinary charges as presenting him with the first available opportunity to challenge the settlement agreement, specifically by obtaining a transfer to another institution where he would feel more safe in repudiating the settlement. Accordingly, as part of what he termed a "subterfuge" to obtain such a transfer, he wrote a letter to defendant Cain on the date of the disciplinary charges, stating that he planned to inform the Court of the defendant's threat to have him killed and that he planned to seek reinstatement of the underlying lawsuit. Specifically, the plaintiff's letter stated:

> I'm letting you know what I'm going to do if I'm not returned to Hickory 4, bed 33, with my law library job, trustee status, hobby shop box and/or all other privileges. What I plan on doing and will do is inform the court ... and will try to have the church suit reinstated and I will inform them that you told me that if I didn't take the deal you offered, you'd have me killed and have my body burned in the incinerator ... and that I was coerced to settle.

---

2. Defendant Cain testified that, because of applicable prison regulations, the plaintiff was not immediately entitled to the highest wages associated with his assigned job as an inmate counsel. The plaintiff, however, does not point to this discrepancy as a reason for abrogation of the settlement agreement, and he appears to have accepted the rationale given by the defendant for this apparently minor variation in the terms of the agreement. Defendant Cain also testified that, although not a part of the settlement agreement, he subsequently transferred $20.00 into the plaintiff's inmate account as a gesture of generosity and encouragement.

(Emphasis in original). In response to the plaintiff's letter, defendant Cain wrote back to the plaintiff on February 7, 2011, expressing disappointment that the plaintiff was not taking responsibility for the improper conduct outlined in the disciplinary reports. The plaintiff then filed a formal administrative grievance ("ARP") on February 18, 2011, explicitly asserting the claim that the settlement agreement of August 25, 2010, had been coerced by a threat of death from defendant Cain. Upon receipt of this ARP in defendant Cain's office on February 22, 2011, defendant Cain took action to have the plaintiff immediately transferred to another institution. Thus, the plaintiff testified that his "subterfuge" worked, i.e., by writing the letter of February 3, 2011 and the ARP of February 18, 2011, he obtained the desired transfer and, once confined at another institution, could pursue his claim of coercion with less fear of reprisal from defendant Cain. The Court notes, however, that neither the referenced letter nor the ARP contained any mention of a transfer or a request for same.

The plaintiff elicited testimony from several additional witnesses regarding the referenced transfer from LSP on February 23, 2011. Jeff Travis, the Chief of Operations for the Louisiana Department of Public Safety and Corrections ("DOC"), testified that defendant Cain telephoned on February 23, 2011, and requested that the plaintiff be transferred because the plaintiff was making threats that defendant Cain was going to cause the plaintiff harm. According to Chief Travis, defendant Cain communicated that the defendant was not comfortable with these threats and felt it best to transfer the plaintiff to another institution. Chief Travis further testified that, as a general matter, inmates with life sentences such as the plaintiff are confined at LSP but may be transferred to other institutions if a waiver is granted by DOC headquarters. Chief Travis testified that he agreed to an administrative transfer of the plaintiff for the reasons provided by defendant Cain. He further testified that he did not recall defendant Cain providing any additional information regarding disciplinary charges which may have been pending against the plaintiff at the time of the transfer.

Jerry Goodwin, the warden of the institution to which the plaintiff was transferred, testified that he received a telephone call from defendant Cain about the plaintiff's transfer, and he recalls that defendant Cain advised that the plaintiff had been involved in an incident in the LSP kitchen or dining area and had thereafter refused orders to be restrained. Warden Goodwin further testified that defendant Cain advised that the plaintiff was making threats that defendant Cain was going to cause the plaintiff harm. Accordingly, Warden Goodwin understood from defendant Cain that the

plaintiff was being transferred as an administrative matter in order to avoid the possibility that the plaintiff would suffer harm at LSP and then blame such harm on defendant Cain. Finally, Warden Goodwin testified that the plaintiff was placed in a maximum security administrative segregation cell upon arrival at the institution, not protective custody, and was later provided with a hearing in connection with the disciplinary charges pending against him.

Ass't Warden Cathy Fontenot testified that she processed the plaintiff's transfer on February 23, 2011, as an "emergency transfer," that it was her understanding that the transfer was for disciplinary reasons, and that she recalls that the plaintiff was to have a disciplinary hearing at the transferee institution in connection with pending disciplinary charges. She testified that an "emergency transfer" is simply one which is processed en route, not as a matter of normal procedure, and is one that has already been approved by headquarters. Although such transfers are not common, she testified that they do occur on occasion. She further testified that she was verbally instructed by defendant Cain to process the plaintiff's transfer, that defendant Cain had already spoken with and obtained approval for the transfer from Chief Travis and Warden Goodwin, and that she did not recall defendant Cain providing any specific reason for the transfer. Although the plaintiff attempted to elicit from Warden Fontenot that the resulting disciplinary hearing at the transferee institution was deferred pending an investigation at LSP (which the plaintiff contends never took place), she testified that the referenced disciplinary hearing was only deferred pending a "comment" from LSP personnel and that no investigation was anticipated.

Finally, defendant Cain testified that when he received the plaintiff's initial letter of February 3, 2011, wherein the plaintiff complained of the allegedly wrongful disciplinary charges of that date and threatened to accuse defendant Cain of coercion in connection with the settlement of five months previously, such receipt represented the defendant's first indication whatever that the plaintiff was not happy with the settlement. Warden Cain further testified that he found the plaintiff's letter to be ridiculous, and he wrote back to the plaintiff, urging the plaintiff to take responsibility for the wrongful conduct outlined in the disciplinary report. When defendant Cain thereafter received the plaintiff's ARP, on February 22 or 23, 2011, which ARP formally accused defendant Cain of having threatened the plaintiff and of having thereby coerced the plaintiff into settlement, the defendant viewed the matter as having become more serious, specifically because of the more public nature of the ARP process. Accordingly, being concerned that the plaintiff would potentially

harm himself or have another inmate cause him harm and thereafter accuse the defendant of causing such harm, the defendant contacted Chief Travis and obtained approval for the plaintiff to be transferred to another institution. When the plaintiff sought to elicit testimony explaining why, if the transfer was purportedly for the purpose of protection, the plaintiff was not placed in protective custody at the transferee institution, defendant Cain explained that the transfer was not for the purpose of protecting the plaintiff but, rather, was for the purpose of protecting the defendant and the institution from potential accusations and from further potential litigation by the plaintiff. Thus, there was no reason for the plaintiff to be placed in protective custody at the transferee institution. The defendant further testified that the disciplinary charges pending against the plaintiff were serious inasmuch as the plaintiff was accused of openly refusing orders from a security officer in a setting where other inmates were present and could react with violence.

Notwithstanding the plaintiff's testimony that his transfer in February, 2011, was the result of a successful "subterfuge" which he implemented specifically in order to obtain such a transfer, the Court notes that the plaintiff elicited seemingly inconsistent testimony from several witnesses which suggested that such a transfer was not reasonably to be anticipated. Specifically, Warden Goodwin testified that although he might consider transferring an inmate who complained of threats from prison personnel, he had never in fact done so. Similarly, Chief Travis testified that he had never personally been involved in such a transfer although he acknowledged that such transfers had taken place in the past. Finally, defendant Cain testified that the plaintiff's transfer was the first and only time that he had ever requested that an inmate be transferred because of accusations of potential harm such as made by the plaintiff.[3] Thus, it strains credulity to suggest that the plaintiff's transfer was the result of a plan or "subterfuge" implemented by him solely and explicitly to obtain such a transfer.

Finally, the plaintiff sought to elicit testimony from defendant Cain and several witnesses regarding instances of past alleged wrongdoing by the defendant in an effort to show a pattern of similar wrongdoing by the defendant. To this end, defendant Cain was questioned regarding his

---

3. The Court here notes that the plaintiff, to some extent, impeached the testimony of defendant Cain by pointing out that the defendant responded to one of the plaintiff's Interrogatories by stating that "anytime" the defendant receives threats "like this" from an inmate, he "exercise[s] due diligence to move the inmate out immediately."

involvement in the death of co-inmate Joel Durham in December, 1999. The defendant testified that on December 28 of that year, he spearheaded an advance on a building at LSP where co-inmate Durham and several other inmates were holding hostages. According to the defendant, he did in fact give the order for a SWAT team to forcibly enter the building and, if an opportunity presented itself, to bring down the offending inmates. Defendant Cain further testified, however, that after the uprising was contained and after the body of inmate Durham, who had been shot during the assault, was recovered, the defendant had no involvement in the decision to cremate the body. To the contrary, the defendant testified that his only involvement was to make a decision that inmate Durham would not be buried on LSP property in light of his involvement in the uprising, during which a security officer had also been killed (by inmates). The defendant was also questioned regarding several other instances when, according to the plaintiff, the defendant had sought to obtain financial advantage through coercion and/or bribery or had threatened inmates who caused him trouble. These instances included the defendant's allegedly placing pressure on an author or journalist (Daniel Bergner) to donate money to LSP in exchange for access to the prison, on the defendant's allegedly placing pressure on a livestock owner or businessman (Daniel Klein) to donate money in exchange for defendant agreeing to use the livestock in the prison rodeo, and an instance when the defendant allegedly made threats against a co-inmate (William Kissinger) because the inmate had publicly accused the defendant of wrongdoing and prompted a federal investigation and lawsuit in 1996. Although the Court allowed limited testimony from defendant Cain regarding these alleged events, the Court ultimately concluded, as contended by the defendants' attorney, that the alleged other bad acts committed by defendant Cain were both temporally distant and essentially dissimilar to the threats alleged by the plaintiff in the instant case. Accordingly, while the Court allowed the plaintiff to make a proffer of the testimony which would allegedly be provided by witnesses Bergner, Klein and Kissinger, the Court did not allow testimony from these witnesses to any extent.

<u>Applicable Law</u>

It is well-settled in this Circuit that the validity of a settlement agreement is determined by federal law, "at least where the substantive rights and liabilities of the parties derive from federal law." <u>Mid-South Towing Co. v. Har-Win, Inc.</u>, 733 F.2d 386 (5th Cir. 1984). A settlement agreement is essentially a contract, and in determining the validity thereof, the federal law of contracts

incorporates "the core principles of the common law of contracts that are in force in most states." Smith v. United States, 328 F.3d 760 (5th Cir. 2003). These core principles may be derived from the Restatement 2d of Contracts. Deville v. U.S. ex rel. Dept. of Veteran Affairs, 202 Fed.Appx. 761 (5th Cir. 2006). See also Reed v. Gallegos, 2008 WL 2714082) (S.D. Tex., July 9, 2008) (applying federal law, as elucidated in the Restatement, to a settlement dispute involving an inmate's claim of duress in a case brought pursuant to 42 U.S.C. § 1983).

Under Section 175 of the Restatement 2d of Contracts, "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." See also Deville v. U.S. ex rel. Dept. of Veteran Affairs, supra, (recognizing that, "[u]nder the common law, a contract is voidable by the victim of duress"). As further made clear in the Restatement,

> Threats that would suffice to induce assent by one person may not suffice to induce assent by another. All attendant circumstances must be considered, including such matters as the age, background, and relationship of the parties. Persons of a weak or cowardly nature are the very ones that need protection; the courageous can usually protect themselves.... However, ... circumstantial evidence may be useful in determining whether a threat did in fact induce assent....

The party seeking to abrogate a settlement agreement has the burden of establishing that the agreement is invalid because of duress or some other defense. See Williams v. Phillips Petroleum Co., 23 F.3d 930 (5th Cir.), cert. denied, 513 U.s. 1019, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994). In addition, the Fifth Circuit has made clear that a "delay in raising a claim of duress ... is compelling evidence that there was in fact no duress." Palmer Barge Line, Inc. v. Southern Petroleum Trading Co., Ltd., 776 F.2d 502 (5th Cir. 1985). See also Jarallah v. Sodexo, Inc., 452 Fed.Appx. 465 (5th Cir. 2011) (holding that "under federal law, '[e]ven if a release is tainted by misrepresentation or duress, it is ratified if the releasor retains the consideration after learning that the release is voidable'").

## Findings of Fact

The credible evidence supports the following findings of fact. On August 25, 2010, five days after the issuance of a Magistrate Judge's Report in this case which denied the defendants' pending Motion to Dismiss and which noted the existence of substantive issues relative to the plaintiff's underlying claims, the plaintiff was called to the office of defendant Warden Cain and was there encouraged, over the course of several hours, to enter into a settlement agreement relative to those

claims. It appears clear that defendant Cain was likely highly motivated to settle the plaintiff's claims inasmuch as the defendant admitted in testimony that he was "concerned" about the lawsuit, about its potential impact upon religious programs at LSP, and about the potential time, expense and disruption involved in defending against the lawsuit. The plaintiff apparently recognized his position of relative strength and took advantage of this position to negotiate very favorable settlement terms, including the offer of virtually all that the defendant could provide short of releasing the plaintiff from confinement. The plaintiff continued to resist settlement, however, and in light of defendant Cain's strong motivation to settle, it is possible that the defendant in fact utilized language that could be inferred by the plaintiff as threatening during one or more of the times that the plaintiff and defendant were alone together. The Court does not find credible, however, the plaintiff's assertion that defendant Cain overtly threatened to have the plaintiff killed and cremated. Nor does the Court find, ultimately, that the plaintiff's settlement was motivated in fact by the defendant's threatening words or conduct. All witnesses testified that the plaintiff appeared calm, comfortable and cordial during all aspects of the settlement negotiations, that he was talking and laughing with defendant Cain and with prison personnel, that he did not appear upset or nervous in any way and that, during a 15-minute telephone conversation with Mayor Candice Watkins, he was laughing and "giggling" throughout. At the conclusion of the negotiations, the plaintiff appeared to be very happy with the terms of the settlement agreement. Although the plaintiff emphasized that the witnesses did not know him well enough personally to reliably assess whether he was under duress, the Court finds credible their consistent testimony regarding his demeanor, which testimony supports a finding that the plaintiff was not significantly concerned for his safety during the settlement negotiations.

In addition to the foregoing, the plaintiff's conduct after the settlement is not consistent with his assertion that he was unhappy with the terms thereof. He concedes that he obtained the benefit of all that was offered to him during the settlement negotiations, including, <u>inter alia</u>, a transfer from a maximum security working cellblock to dormitory housing in the main prison complex, a reclassification to trustee status, a job as an inmate counsel in the prison library, an assigned hobby-shop box, the expungement of two disciplinary reports from his prison record, and the clearing of all of his debts with prison officials. For a period of over five months after the August 25, 2010, settlement, during which time he enjoyed these benefits, the plaintiff made no complaint

whatever regarding the settlement agreement. It was only upon the issuance of disciplinary charges against him on February 3, 2011, which charges resulted in his immediate placement in an administrative segregation cell, that the plaintiff made the first such complaint. It further appears that the plaintiff faced, as a result of those charges, the potential loss of all of the above-described benefits and privileges if found guilty. This timing leads the Court to conclude that the plaintiff's attempt to abrogate the settlement agreement was motivated, not by the fact that the initial settlement was coerced, but rather by the fact that the plaintiff now faced retraction of all of the benefits derived therefrom. This is further confirmed by the substance of the letter which he wrote to defendant Cain on February 3, 2011, the date of the referenced disciplinary charges, wherein he made explicitly clear that he wanted to <u>retain</u> the benefits derived from the settlement agreement, specifically that he "<u>want[ed]</u> to go back to Hickory 4, bed 33, with [his] trustee status, job, hobby shop box and all other privileges." (Emphasis added). He further stated in that correspondence that he would seek to abrogate the settlement agreement only "if" he did not retain all of the benefits of the settlement. Had the plaintiff not cared about the benefits derived from the settlement, he would not have threatened to seek abrogation thereof only "if" those benefits were not returned to him. Conversely, the plaintiff's correspondence makes implicitly clear that, if he were allowed to retain all of the benefits and privileges derived from the settlement, he would take no action to abrogate the agreement.

In addition to the foregoing, as noted above, it is not credible that the plaintiff wrote the letter of February 3, 2011, only as a "subterfuge" to obtain a transfer to another institution. Specifically, a transfer for the reason stated could not realistically have been planned for or anticipated by the plaintiff inasmuch as such a transfer had never previously been granted by Warden Cain or by Warden Goodwin or Chief Travis.[4] Nor is it credible that the referenced disciplinary charges were

---

4. Further, the result of the plaintiff's transfer is that it largely eliminated any possibility of his obtaining recovery in connection with the underlying substantive claims. Specifically, when the plaintiff was transferred to David Wade Correctional Center, Homer Louisiana, his claim for declaratory and/or injunctive relief was rendered substantially moot. See, e.g., Herman v. Holiday, 238 F.3d 660 (5th Cir. 2001) (recognizing that an inmate's transfer from an offending institution normally "render[s] ... claims for declaratory and injunctive relief moot"). Further, in the absence of any allegation that the plaintiff suffered any physical injury as a result of the defendants' alleged wrongful conduct in connection with the underlying claims, he is precluded from recovering any compensatory damages by virtue of 42 U.S.C. § 1997e(e), which statute prohibits the recovery of compensatory damages to an inmate who has not sustained any physical injury. Accordingly, in the event that this case were reinstated on the Court's docket, the most that the plaintiff would be

the "first opportunity" perceived by the plaintiff, as he stated, to take action to abrogate the settlement agreement, or that he would have taken action earlier if an opportunity had presented itself. If all that the plaintiff required to take action to abrogate the settlement agreement was the issuance of disciplinary charges against him, he could have violated any number of prison rules at any time during the five months after the settlement agreement and obtained one or more disciplinary charges.[5] Nor is the Court persuaded by the plaintiff's contention that it was the asserted falsity of the referenced disciplinary charges which provided him with the desired opportunity. To the contrary, the plaintiff effectively admitted in his letter to defendant Cain on February 2, 2011, that he had engaged in conduct which violated prison rules. Specifically, the plaintiff admitted therein that, when ordered by a security officer on that date to leave the prison dining hall, he explicitly refused, stating that he "wasn't going to leave" until he had eaten, and that when told by the officer that he was going to be locked up, the plaintiff again resisted, stating to the officer, "[you] can lock me up, but I'm going to eat." Without more, this admitted conduct amounted to a violation of Rule 5 of the prison Rulebook, which states that "[i]nmates must obey direct verbal orders cooperatively and promptly; not debate, argue, or ignore them before obeying."[6] As further noted by defendant Cain in his testimony, the referenced disciplinary charge constituted a serious rule violation inasmuch as the plaintiff's action in disobeying the direct orders of a security officer in a crowded dining area created a potentially dangerous situation among the inmates who were present at that location.

Finally, the Court does not find credible the plaintiff's contention that he feared for his safety while confined at LSP and believed that he could not take action to abrogate the settlement until

---

able to recover is nominal damages (not to exceed $1.00) and/or punitive damages, and with regard to the latter, only if he were able to establish the requisite "evil intent" or "reckless or callous indifference" which is necessary for the recovery of such damages, see Williams v. Kaufman County, 352 F.3d 994 (5th Cir. 2003).

5. The Court notes that the plaintiff in fact received a disciplinary report in October, 2011, charging him with a "Schedule A" offense, which offense carries with it less onerous potential punishments than do the "Schedule B" offenses with which he was charged in February, 2011.

6. A District Court may take judicial notice of the record in prior related proceedings. Missionary Baptist Foundation of America, Inc. v. Wilson, 712 F.2d 206 (5th Cir. 1983). The Court hereby takes judicial notice of the prisoner rule book, approved by this Court in Hayes Williams v. John McKeithen, et al., CA 71-98-B (M.D. La.), affirmed, 547 F.2d 1206 (5th Cir. 1977), and amended from time to time thereafter.

he was first transferred to another institution. To the contrary, while still confined at LSP, the plaintiff forwarded correspondence to defendant Cain on February 3, 2011, and directly threatened defendant Cain therein with publication to the Court of the defendant's alleged coercion and threats unless all privileges were restored to the plaintiff. When those privileges were not thereafter immediately reinstated, the plaintiff initiated, while still confined at LSP, a formal administrative grievance wherein he accused defendant Cain of coercion and threats in connection with the referenced settlement. It is thus not believable that fear of reprisal from defendant Cain prevented the plaintiff from asserting his claims until and unless he was transferred from LSP. Rather, it is far more likely that the sole reason for the plaintiff's failure to dispute the settlement agreement prior to February, 2011, was that until the referenced disciplinary reports, the plaintiff was enjoying the benefits of the agreement and that, after that point, he faced a loss thereof.

Based on the foregoing, the Court concludes that the referenced settlement agreement was entered into voluntarily by the plaintiff on August 25, 2010, and that it was not in fact induced by threats, actual or implied, made by defendant Cain. Further, and in any event, the Court finds that the plaintiff thereafter acquiesced in the settlement agreement by enjoying the benefits thereof for a period of more than five months and by failing to take any action to repudiate same until the benefits thereof appeared to be on the verge of retraction. This is made abundantly clear by the plaintiff's correspondence of February 3, 2011, wherein he explicitly stated his desire to retain the benefits of the agreement and threatened to seek repudiation thereof only if those benefits were not restored.[7] This correspondence is not consistent with the plaintiff's claim that he was never happy with the settlement agreement and that he took the first opportunity which presented itself to repudiate same. Accordingly, the plaintiff's Motion to Withdraw and/or to Reinstate Lawsuit, rec.doc.no. 37, should be denied.

---

7. The plaintiff contends that he never ratified the settlement agreement and, in support of this contention, points to a telephone conversation which he allegedly had with attorneys representing the defendants wherein he allegedly offered to return all of the benefits derived from the settlement. This telephone conversation, however, took place after the plaintiff was charged with the referenced disciplinary reports of February 3, 2011, after the retraction of the referenced benefits by reason of his transfer to another institution and the finding of guilt in connection with those charges, and after he filed the instant motion to repudiate the settlement. He made no attempt whatever to return any of the benefits derived from the settlement during such time as he could still enjoy them.

## RECOMMENDATION

It is recommended that the plaintiff's Motion to Withdraw and/or to Reinstate Lawsuit, rec.doc.no. 37, be denied and that this action be terminated on the Docket of the Court.

Signed in Baton Rouge, Louisiana, on August 22, 2012.

**MAGISTRATE JUDGE DOCIA L. DALBY**